## IN THE MATTER OF DAVID K. TRASK, ATTORNEY AT LAW.

### No. 1862.

TRIAL JANUARY 14, 15, 16, 17, 18, 1929.　　DECIDED JANUARY 29, 1929.

PERRY, C. J., BANKS, J., AND CIRCUIT JUDGE WATSON IN PLACE OF PARSONS, J., ABSENT THROUGH ILLNESS.

OPINION OF THE COURT BY BANKS, J.

This is an original proceeding instituted by the attorney general of the Territory for the purpose of disbarring David K. Trask, a district court practitioner.

On the 21st day of December, 1926, Trask was admitted by the circuit judge of the fifth judicial circuit to practice as an attorney at law in all of the district courts of the Territory and a license so authorizing him was duly issued. Persons licensed to practice in these courts are not authorized to practice in what are known as the higher courts, that is, in the circuit courts and the supreme court. The information filed against Trask in the instant case contains four specific charges of misconduct.

In his return the respondent denies that he committed any of the first three offenses described in the information but, in effect, admits that he committed the fourth offense and sets up certain facts by way of excuse or mitigation of his conduct.

The material portions of the first charge are in substance that on or about the 22d day of March, 1928, Mrs. Alice Bell went to Trask's office in the city of Honolulu and then and there consulted him regarding a proceeding for divorce which she wished to institute against her husband, Joseph Bell; that after obtaining from Mrs.

Bell a detailed statement of her domestic troubles Trask charged her a fee of $60, which she at a subsequent time on the same day paid and for which Trask gave his receipt, which receipt contained the statement "on account of divorce matter;" that during her two consultations with Trask on this date he stated to her that he would be her lawyer and get the divorce for her and represented to her that he was a legally and regularly qualified attorney, licensed to practice law in the circuit courts of the Territory of Hawaii; that on the 24th day of March following, Mrs. Bell returned to Trask's office accompanied by her mother, Mrs. Nancy Ho See, and that during this visit Trask stated to Mrs. Bell that he and Norman K. Lyman (who at that time was a duly licensed member of the bar of this court) were partners and that Lyman would represent her; that Trask then conducted Mrs. Bell and her mother to Lyman's office where he again stated that he and Lyman were partners and that he (Trask) was qualified and licensed to practice law in all the courts of the Territory of Hawaii and that Lyman would represent Mrs. Bell; that after making this statement Trask left Lyman's office and did not return during the time Mrs. Bell and her mother were there; that while Mrs. Bell and her mother were in Lyman's office Mrs. Bell signed her name to a libel for divorce and that at that time Mrs. Bell and her mother, Mrs. Ho See, acting as her daughter's next friend, also signed a pretended verification of the libel; that neither Mrs. Bell nor Mrs. Ho See signed these respective verifications in the presence of David K. Trask (who was a duly commissioned notary public) nor did either of them at that time appear before Trask to swear to the libel or the pretended verifications; that notwithstanding this Trask did on the 24th day of March, 1928, affix his official jurat and seal to the said pretended verification of Mrs.

Bell and that of Mrs. Ho See; that subsequently, on or about the 2d day of July, 1928, E. R. McGhee, deputy attorney general, acting at the direction of the attorney general, called Trask to the office of the attorney general and there, in the presence of Mrs. Bell, requested Trask to return to Mrs. Bell the sum of $60, which Trask had received on account of said divorce matter and that Trask refused to return the money or any part thereof; that after further discussion Trask agreed to employ and pay a properly qualified attorney to represent Mrs. Bell in her divorce action; that on or about the 20th day of September, being informed by Mrs. Bell that Trask had not complied with his promise, the attorney general instructed McGhee to communicate this information to Trask and inquire of him what he had done in the premises; that in a subsequent telephonic conversation between McGhee and Trask on the subject Trask used vile, insulting, abusive and threatening language towards McGhee.

The undisputed evidence shows that Mrs. Bell did consult Trask regarding a suit for divorce against her husband and that he advised her on the subject and collected a fee of $60 from her which he divided in equal proportions with Lyman. He also took her to Lyman's office where the libel was prepared under the latter's direction and signed by him as attorney for the libelant and subsequently filed in the office of the clerk of the circuit court. The evidence also shows without conflict that on the occasion mentioned in the information Trask in his conversation with McGhee over the telephone used very insulting and threatening language.

The evidence relating to the much more serious charges of having represented himself to Mrs. Bell as a lawyer licensed to practice in the circuit courts of the Territory and of having affixed his jurat and official seal to verifications without having before him the per-

sons who signed the verifications and without having administered the oath to them was in sharp and irreconcilable conflict. We deem it unnecessary to set out the details of this evidence. The burden was on the informant to prove the disputed allegations of the information by such a preponderance of the evidence as would convince us of their truth. This burden, in our opinion, was not sustained. The evidence was so conflicting as to leave us in doubt as to the truth and we feel that it would be improper for us to base a judgment of disbarment upon it. If these allegations had been satisfactorily proven they would have constituted grave professional misconduct which would have justified our severe condemnation.

The second charge against Trask is in substance that not being licensed to practice law in the circuit courts of the Territory Trask did on or about the 25th day of January, 1928, enter into an agreement with one Frank Baroza whereby he promised and agreed to secure a divorce for Baroza and induced Baroza to believe that he (Trask) was legally qualified to and would personally use his professional services in securing said divorce and that Trask collected from Baroza a fee of $75 for the professional services which he (Trask) agreed to render him and that this fee was exacted from Baroza for services which Trask was not, and knew he was not, legally qualified to perform; that later, on or about the 15th day of February, 1928, Baroza informed Trask that he and his wife had settled their differences and that a divorce was no longer desired and that Baroza demanded from Trask a return of the $75 which he had paid to Trask as a fee and that Trask refused to return the said $75 or any part thereof, giving as his reason that he (Trask) had already performed legal services for Baroza in said divorce matter by filing a libel for divorce.

It is admitted by Trask that Baroza consulted him

regarding a divorce and that he (Trask) advised Baroza in relation thereto and collected from him the sum of $75. He also admits that Baroza, after having satisfactorily settled his matrimonial troubles, demanded the return of the said $75 and that he (Trask) refused to return it.

Trask denies that he at any time represented to Baroza that he was licensed to practice in the circuit courts or that he said or did anything to induce Baroza to believe that he would personally represent him in his contemplated suit for divorce. Baroza (whose name seems also to be Baruz), who was called as a witness by the attorney general, was very uncertain and vague in his recollection of what representations Trask made to him concerning his right to practice in the circuit courts or as to whether Trask agreed that he would personally represent him in the divorce suit. Trask, who was called as a witness in his own behalf, testified that he made no such representations to Baroza nor did he agree to personally represent Baroza. In this state of the evidence we are unable to find that Trask misled Baroza in the manner alleged in the information.

So far as Trask's refusal to return the $75 is concerned, the uncontradicted evidence shows that after receiving this amount from Baroza Trask divided it with Norman K. Lyman, who was at that time a duly licensed member of the bar of this court, and that Lyman prepared and filed in the circuit court a libel for divorce in which Baruz (the same person as Baroza) was the libelant and his wife was the libelee. We think under these circumstances Trask should not be disbarred for refusing to return the $75 which Baroza had paid to him.

We shall later discuss the propriety of a district court practitioner's giving professional advice on matters that could be the basis of litigation only in the circuit court and charging and collecting fees for such advice and

dividing his fees with a regularly licensed attorney.

The third charge made against Trask is that one T. Kaneyoshi, against whom an action had been brought in the district court of Koolaupoko in the City and County of Honolulu, employed Trask to represent him and that during said employment Kaneyoshi gave Trask $40 upon Trask's agreement to pay said amount on account of Kaneyoshi's indebtedness to the plaintiff in the action; that Trask, in violation of his agreement, paid only $25 of the amount given him and converted the remaining $15 to his own use. His employment by Kaneyoshi is admitted by Trask, and also the receipt of the sum of $40 is admitted. It is likewise admitted that only $25 was paid to the plaintiff in the action against Kaneyoshi and that the balance of $15 was kept by Trask. Kaneyoshi, who was called as a witness by the attorney general, testified in support of this charge against Trask and there was also introduced in evidence a receipt which Trask gave to Kaneyoshi at the time he received the $40, which receipt is as follows: "Received from T. Kaneyoshi the sum of forty dollars ($40.00) the same to be offered as part payment to Geo. Curry on the Keau account. Aug 8 1928" (signed) "D. K. Trask." Trask testified that the statement in the receipt of the purpose for which the $40 was given to him was a mistake on his part and was not in conformity with the fact; that he had charged Kaneyoshi a fee of $25 for representing him in the suit brought against him in the district court of Koolaupoko and that when Kaneyoshi brought the $40 to his office it was understood between him and Kaneyoshi that $25 should be paid to the plaintiff in the suit and that he (Trask) should retain $15 as part payment of his fee. There was other evidence which tended strongly to support Trask's version of what occurred between him and Kaneyoshi. For instance, Trask testified that before

Kaneyoshi brought the $40 to his office he (Trask) had conferred with the agent of the plaintiff in the suit against Kaneyoshi and an agreement had been reached whereby Kaneyoshi was presently to pay $25 on account of his indebtedness (which amounted to $250) and $25 each month thereafter until the entire indebtedness was paid. The agent referred to by Trask was called as a witness and his testimony on this point was in exact accord with that given by Trask. Under these circumstances it is very unlikely that Trask would have agreed with Kaneyoshi to turn over the entire $40 to Kaneyoshi's creditor, leaving his (Trask's) fee entirely unpaid. We therefore feel that we are not justified in saying that this third charge against Trask was proven with that degree of clearness which the law requires.

The fourth and final charge against Trask is as follows: "1. That the said David K. Trask immediately upon being licensed to practice law in the district courts of the Territory of Hawaii as aforesaid, did employ one Eduardo Garcia, a person not licensed to practice law in any of the courts of the Territory of Hawaii, as touter and runner to induce and influence criminals, the injured, the ignorant and others to seek the professional advice and services of the said David K. Trask; that the said David K. Trask at said time promised to pay and thereafter in compliance with said promise did pay to the said Eduardo Garcia thirty-five per cent (35%) to forty per cent (40%) of all fees collected, either by the said Eduardo Garcia on behalf of the said David K. Trask or directly by the said David K. Trask, from all such persons as were induced or influenced by the said Eduardo Garcia to consult and/or employ the said David K. Trask, in his professional capacity; that the said David K. Trask, on or about the 14th day of November, 1927, and in pursuance of said agreement with said Eduardo Garcia, did

accept and receive from the said Eduardo Garcia the sum of one hundred dollars ($100.00), exacted and received by the said Eduardo Garcia from one Hipolita Rivera, who was then confined in prison at Ewa, Oahu, on a charge of adultery, upon the representation to the said Hipolita Rivera by said Eduardo Garcia that he, the said Eduardo Garcia would engage the said David K. Trask to secure the release of said Hipolita Rivera from prison and to represent her upon said criminal charge. 2. Your informant alleges and avers that out of the said one hundred dollars ($100.00) received by the said Eduardo Garcia from the said Hipolita Rivera and so delivered to the said David K. Trask by the said Eduardo Garcia, the said David K. Trask, in pursuance of his said agreement with the said Eduardo Garcia, did pay to the said Eduardo Garcia thirty-five dollars ($35.00) of said one hundred dollars ($100.00) as a fee for said Eduardo Garcia's services in securing the said case for him, the said David K. Trask."

Trask's return to this part of the information is as follows: "Said David K. Trask admits that during the latter part of the year 1927 he did employ Eduardo Garcia, and alleges that he, the said David K. Trask, was and is unfamiliar with the Filipino language while the said Eduardo Garcia is a Filipino and speaks said language; that one of the purposes of said employment of said Eduardo Garcia was to secure the services of one who came in contact with and understood the language of his race; that said David K. Trask admits that he did agree to pay to said Eduardo Garcia a percentage of the net fees collected for services to be rendered by him, said David K. Trask, to clients who came to him through the instrumentality of the said Eduardo Garcia; however, the said Eduardo Garcia, by said agreement, did not receive the said percentage solely for the reason that he brought

the business to said David K. Trask; for said compensation said Eduardo Garcia performed services as interpreter and/or investigator in and about such employment; said David K. Trask further alleges that when he was admitted to practice in the district courts of the Territory of Hawaii he understood that the arrangement which he had entered into with the said Eduardo Garcia followed a practice that had prevailed in this jurisdiction for a long period of time; that it was no part of his said arrangement with said Eduardo Garcia to incite or stir up litigation or to impose upon or to defraud the ignorant or anyone else; that said David K. Trask admits that pursuant to said arrangement with said Eduardo Garcia he was employed by one Hipolita Rivera through the instrumentality of said Eduardo Garcia; that the said Hipolita Rivera is a Filipino who does not understand the English language; that said Eduardo Garcia made visits to the prison where the said Hipolita Rivera was confined for the purpose of making arrangements for the employment of said David K. Trask and to obtain the facts in connection with the charge pending against her; that said David K. Trask admits paying to said Eduardo Garcia for said services so performed by him the sum of $20.00 but denies that the same was so paid to said Eduardo Garcia solely for securing the said case for him; said David K. Trask further alleges that if he has, by said arrangement with said Eduardo Garcia as herein admitted, violated the ethics of the profession and/or has conducted himself in an unprofessional manner, he is extremely regretful; and can only say, in extenuation, that he has but followed a practice which has prevailed for a long period of time and which, however objectionable, never to his knowledge has been invoked as a basis for disbarment proceedings."

It will be observed from the return that the charge

now under consideration is in its substance admitted to be true. It was also thoroughly established by the testimony of Eduardo Garcia, who was called as a witness by the attorney general, and by the testimony of Trask himself. The effect of the testimony was to prove beyond question that sometime during the year 1928 Trask employed Garcia to act as a Filipino interpreter and also to induce members of the Filipino race and others who might desire the services of a lawyer to employ Trask to represent them. For his services in inducing persons to take their business to Trask and also to act as interpreter Trask agreed to pay Garcia thirty-five per cent of whatever fees were collected from such persons. This percentage was to be paid to Garcia whether his services as an interpreter were required or not. In pursuance of this agreement Garcia went actively to work and remained in Trask's employment for eight months. During this time he induced persons who came to see him at his house for the purpose of asking advice about the employment of a lawyer to employ Trask. On other occasions he took persons whom he met on the street and who needed a lawyer to Trask at his office in Honolulu. In other instances, when he learned that some one was in trouble, he looked up such person and gave him Trask's card. During some of the months of his employment he took as many as ten cases to Trask. During other months he took as many as three and in some months he took none. In some instances Garcia determined what fee should be charged and collected it. In other instances Trask did this. In every instance, when he took a case to Trask, he received from Trask thirty-five per cent of the fee collected. Garcia's compensation, derived from fees which Trask divided with him, ranged from $50 to $100 per month. On one occasion Garcia, being informed that a Filipino man and woman were in the jail at Pearl City charged with

adultery, obtained admission to the jail and succeeded in having the prisoners liberated on bond. He collected a fee of $100 from them which he turned over to Trask and received from Trask $40 in return.

These facts confront us with the question whether it is unethical and unprofessional for attorneys at law, who are licensed to practice in the courts of record or in the district courts, to employ agents or "runners" to procure clients for them, by solicitation or otherwise, upon an agreement, express or implied, to divide with such agents or runners the fees collected from such clients or to otherwise compensate such agents or runners. We have no hesitation in answering this question most emphatically in the affirmative. This conclusion is fully justified by our own apprehension of the evils that must inevitably result from such conduct on the part of lawyers and by expressions of opinion from other authorized sources. Among these evils are the dishonor brought upon the legal profession, the temptation offered by irresponsible persons to foment litigation, the incentive to charge more than if there were no division of fees and the injustice done to ignorant and uninformed laymen. Nothing is more apt to subject an honorable and distinguished profession, whose history is replete with high endeavor and brilliant achievement, to suspicion and distrust than the activities of hired agents who, under the stimulus of a promised division of fees or other compensation, busy themselves in bringing clients to their employers. Moreover, the lawyer, who, from whatever motive, employs such agents, imperils his professional standing and puts himself in danger of severe judicial discipline. The committee of the American Bar Association on professional ethics and grievances, in the report which it made to the association in Detroit in 1925, said: "Society has seen fit, for its own benefit and protection, to limit the practice

of law to those individuals whom it has found duly quali-
fied in education and character. The permissive right
conferred on the lawyer is an individual and limited privi-
lege subject to withdrawal if he fails to maintain proper
standards of moral and professional conduct. Neither
this privilege, nor any responsibility or duty connected
therewith, can be delegated to or shared with a layman.
As the lawyer cannot share his professional responsibility
with a layman or lay agency, he cannot properly share
his professional emoluments with them. This of itself
is sufficient to render it improper for a lawyer to allow
his services to be sold or dealt in by any layman or lay
agency. But there is yet another reason why such a
practice is abhorrent. The essential dignity of the pro-
fession forbids a lawyer to solicit business or exploit his
professional services. It follows that he cannot properly
enter into any relations with another to have done for him
that which he cannot properly do for himself. It must
therefore be held that the furnishing, selling or exploit-
ing of the legal services of members of the bar is
derogatory to the dignity and self-respect of the profes-
sion, tends to lower the standards of professional
character and conduct and thus lessens the usefulness of
the profession to the public, and that a lawyer is guilty
of misconduct, when he makes it possible, by thus allow-
ing his services to be exploited or dealt in, for others to
commercialize the profession and bring it into disrepute.''

In its canons of professional ethics, the American Bar
Association has this to say (Sec. 28) : "It is disreputable
to hunt up defects in titles or other causes of action and
inform thereof in order to be employed to bring suit, or
to breed litigation by seeking out those with claims for
personal injuries or those having any other grounds of
action in order to secure them as clients, or to employ
agents or runners for like purposes, or to pay or reward,

directly or indirectly, those who bring or influence the bringing of such cases to his office, or to remunerate policemen, court or prison officials, physicians, hospital attaches or others who may succeed, under the guise of giving disinterested friendly advice, in influencing the criminal, the sick and the injured, the ignorant or others, to seek his professional services." And the bar association of Hawaii, in its by-laws, declares in section 11: "It shall be deemed unprofessional for any member of the association to give, or allow, any commission, bonus or reward to any person not a member of the bar, for any legal business of what kind or nature soever which may be brought to him by such person." Leaming, in his book entitled "A Philadelphia Lawyer in the London Courts," makes the following quotation from the ethics of the English bar: "Any barrister who gave any commission or present to any one introducing business to him would be guilty of most unprofessional conduct which would, if detected, imperil his position as a barrister."

In *Meguire* v. *Corwine*, 101 U. S. 108, Corwine, who was evidently a lawyer, made an agreement with Meguire that if Meguire would procure Corwine's employment by the United States government to represent it in certain litigation, he (Corwine) would give him one-half of all the fees which he collected. Meguire secured Corwine's appointment as special counsel for the government and Corwine was paid a fee of $29,950. Meguire sued for the recovery of the proportion of this sum which he claimed was due him under the agreement. The Supreme Court of the United States held that Meguire could not recover because the contract was against public policy and therefore void. In its brief discussion of the question the court said at page 111: "The law touching contracts like the one here in question has been often considered by this court, and is well settled by our adjudications." (Citing

cases) "It cannot be necessary to go over the same ground again. To do so would be a waste of time. The object of this opinion is rather to vindicate the application of our former rulings to this record than to give them new support. They do not need it. Frauds of the class to which the one here disclosed belongs are an unmixed evil. Whether forbidden by a statute or condemned by public policy, the result is the same. No legal right can spring from such a source." The court evidently saw the same evils in the contract before it as we see in the agreement between Trask and Garcia. In view of the consensus of opinion among lawyers of good repute concerning the employment by members of the bar of agents or runners and the opinion of the highest court of our country we would be remiss in our duty if we should place this court in opposition.

There is another question arising out of the facts of this case upon which we think we should express our views. Trask testified that in the two divorce cases which came to him, namely, the Bell case and the Baroza case, he gave legal advice to his clients, for which he collected fees. Under his license as a district court practitioner it was improper for him to have done this. These cases could not possibly have been brought in the district court, where Trask was licensed to practice, but only in the circuit court where he had no authority to practice. A district court practitioner acts under a very limited license. In issuing this license the court does not certify nor intend to certify that the holder is qualified by experience and learning to advise upon all matters regardless of their magnitude or the tribunal in which they may become the subject of litigation. There are uninformed laymen who do not know this. All they know, so far as Trask, for instance, is concerned, is that he maintains a law office and holds himself out as an attorney at law.

What they do not know are the limitations which have been placed upon Trask's authority as an attorney at law and the restricted sense in which the court has certified to his professional ability. It is the duty, therefore, of a district court practitioner, when he is consulted about matters that cannot come within the purview of his license or the purpose of his admission, to fully infrom his client of his lack of ability and his incompetency to properly advise him. His failure to do this and his assumption of legal knowledge which he is presumed not to possess might in many instances result in the loss of valuable rights and would therefore be reprehensible.

Whether under the foregoing circumstances a district court practitioner may with propriety take his client to a lawyer who has a license to practice in all the courts of the Territory depends, in our opinion, on whether there is an agreement, express or implied, between the district court practitioner and the lawyer to whom the client is taken to divide the fee charged and collected or whether such a division is in fact made. If there is such an agreement or such a division we think it would be violative of professional ethics by both the district court practitioner and the full-fledged lawyer. The reason why such an arrangement is unethical and unprofessional on the part of a lawyer holding a general license is that he divides his fee with one who cannot share in the professional services to be rendered and who incurs no professional responsibility in connection with the litigation. It is merely a reward which the full-fledged lawyer pays to the district court practitioner for bringing the case to him. The following question was propounded to the New York County Lawyers' Association: "A. is a practicing attorney in this state. B. is a member of the bar of a western state, but has moved to New York City. B.'s business in New York City is looking after his own

investments. In the course of B.'s business a considerable amount of legal work comes to him, which he cannot handle because he is not a member of the bar of this state, and he desires to turn over all such legal matters to A. for attention, upon condition that A. will give B. a portion of the fees received in such matters. Is it the opinion of your committee that it would be unprofessional for A. to make such an agreement with B.?" and the following answer was given: "The committee is of the opinion that any division of fees by a lawyer should be based upon a sharing of professional responsibility or of legal services, and no such division should be made except with a member of the legal profession associated in the employment as a lawyer. Any other division would appear to be a mere payment for securing professional employment, which is to be condemned." At its semicentennial meeting, held in Seattle during the month of July, 1928, the American Bar Association adopted the following supplemental canon of professional ethics: "No division of fees for legal services is proper, except with another lawyer, based upon a division of service or responsibility. But the established custom of sharing commissions at a commonly accepted rate upon collections of commercial claims between forwarder and receiver, though one be a lawyer and the other not (being a compensation for valuable services rendered by each), is not condemned hereby, where it is not prohibited by statute."

So far as the district court practitioner is concerned, such a division of fees is unethical because, like the lay runner or agent to which we have already referred, he shares in compensation paid for the performance of legal services without aiding or having the right to aid in the performance of such services and without incurring any responsibility to the client to whom the services are rendered. The lay runner, of course, is under no obligation

to conform to the ethics of the legal profession and is therefore beyond judicial supervision, whereas the district court practitioner, being a licensed attorney at law, although in a limited sense, is under an obligation to conform to professional ethics and his conduct is therefore subject to judicial scrutiny. One of the evils growing out of the arrangement above described is that which inheres in a similar arrangement between attorneys at law of any class and runners or agents, namely, the incentive to charge larger amounts than would be charged if there were no division of fees. Another evil is the temptation it offers to a district court practitioner to take his client to a lawyer who is willing to pay the rebate rather than to one who is not willing to pay it, which may lead to the employing of a less qualified man than would otherwise be obtained.

We do not mean to say that it is unethical for a regular practitioner to employ and pay to a district court practitioner or any one else *reasonable compensation for legitimate services* rendered in connection with his business. Nor do we mean to say that it is unethical for a district court practitioner, under these circumstances, to accept *reasonable compensation for such services.*. What we do mean to say is that when, as in the case before us, a district court practitioner takes a matter, which he is unauthorized to handle, to a regular practitioner and there is a division of the fees between the regular practitioner and the district court practitioner, it is mutually unethical.

As has been foreshadowed by what we have already said, it is our conclusion that David K. Trask has been guilty of professional misconduct in three respects, first, in employing an agent or runner; second, in giving legal advice to clients on matters that could not arise or be the subject of litigation in the district court, without first

disclosing his professional limitations, and third, in taking such clients to Norman K. Lyman upon an agreement for a division of the fees and accepting a portion of such fees.

For these offenses we think a measure of discipline should be imposed. Trask is a young man who evidently has had little schooling in professional ethics, and according to his own testimony, which was uncontradicted, when he began practicing he found that other lawyers were doing the very things he now admits that he did and therefore he did not fully realize the impropriety of his conduct. While this does not constitute justification we think it is only fair that it should be considered by way of mitigation. A mere gesture of disapproval, however, such as a reprimand, would not suffice. In order to give emphasis to the disapproval which we think Trask's conduct merits and to give warning that a violation of professional ethics is not to be treated lightly we feel it is our duty to temporarily suspend Trask's license. We think under the circumstances a suspension of thirty days is sufficient. We are further led to be more lenient toward Trask than we otherwise would be because never before has this court had occasion to express its views on the kind of conduct of which Trask was guilty. The discipline which we impose upon him must not, therefore, be regarded as the fixed standard by which our disapproval may hereafter be measured.

A judgment of suspension for thirty days will be signed upon presentation.

*H. R. Hewitt,* Attorney General, and *E. R. McGhee,* Third Deputy Attorney General, in support of the information.

*W. H. Heen,* of the firm of Heen, Godbold & Kelley, for respondent.