## IN THE MATTER OF DELBERT E. METZGER, ATTORNEY AT LAW.

### No. 2008.

ARGUED MARCH 19, 20, 1931.                    DECIDED APRIL 30, 1931.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY PERRY, C. J.

(Banks, J., dissenting.)

This is an information by the attorney general charging the respondent, an attorney duly licensed to practice in all the courts of this Territory, with misconduct. The facts are as follows:

In the course of the trial, before a jury, of a case wherein the indictment charged the two defendants, William Poai and William Spalding, with the crime of murder in the first degree, the prosecution examined a witness by the name of Bailey who testified, as an expert on handwriting, that a certain letter (exhibit "G") and an envelope (exhibit "F") were written by the same hand that had filled in the handwritten portions of a card (exhibit "E"), the handwriting upon which (the card) was admittedly that of the defendant Spalding. The present respondent was the attorney for the two defendants at that trial. He cross-examined Bailey for two and one-half hours and then, at 4 p. m. on Thursday, May 29, 1930, expressing surprise at the introduction by the prosecution of the testimony of Bailey and unpreparedness to conduct what he deemed to be further necessary cross-examination, requested an adjournment for the day and a postponement of the trial until the following Monday morning,—the next day (Friday) being Decoration Day and Saturday being at best a short day for judicial business. The presiding judge granted the request.

On the Saturday morning, with the leave of the court, the respondent, giving to the clerk a receipt for the three papers, withdrew the letter, the envelope and the card and retained them in his possession until the Monday morning shortly before the opening of the trial. Exhibit "E" was a card bearing some typewritten matter and some penciled handwriting. It had come originally from

the office of the sheriff. The respondent procured from one of the clerks in the sheriff's office a few blank cards of the same size and nature of exhibit "E" and taking them to his office fabricated there, with a typewriting machine and by his hand, a facsimile of exhibit "E," duplicating the typewritten matter and the handwritten matter as closely as he could. He was possessed, apparently, of considerable skill in that respect. He duplicated also the notation which had been made on exhibit "E" by the clerk of the court showing the filing of the paper as an exhibit and duplicated also in that connection the clerk's signed initials "B. H. K." Before making the fabrication the respondent consulted at his office two other members of the bar of this court, the late J. W. Russell and Mr. T. E. M. Osorio. The fabrication was approved by these attorneys as a probably successful device for testing the ability and the credibility of Bailey as a handwriting expert and no doubt was expressed by them concerning the ethical quality of the trick.

One Flanary, called in by the respondent for the purpose, was present during all of the time that the respondent made the spurious exhibit "E" and made certain concealed marks upon the paper which would enable him to identify it beyond doubt at the trial, at the proper time.

As stated by Osorio in an affidavit filed in the case at bar, at the conference with the two attorneys prior to the fabrication, "Russell again asked Metzger" (the respondent) "as to his plan for getting it" (the spurious exhibit "E") "into the witness's hand without arousing his suspicions and Metzger again stated his plan, which was the one followed by him." Mr. Osorio was present at the proceedings on Monday and personally saw the method and plan which was followed by the respondent in getting the false card into the hands of the witness Bailey.

932

On Monday morning, shortly before the resumption of the trial, the respondent, retaining the genuine exhibit "E" in his custody, handed to the clerk of the court the letter and the envelope which he had received from the clerk and the spurious exhibit "E." The clerk thereupon offered to return to the respondent his receipt for the papers, but the respondent asked him to keep it for the time being, with a statement to the effect that there would be further transactions in the matter. Respondent at the same time asked the clerk to be extremely careful not to permit any of the three papers just handed to him to leave his custody until the respondent should call for them. This the clerk agreed to do.

On the Thursday a very large part of the two and a half hours of cross-examination by the respondent of the witness Bailey had been devoted to minute inquiries and details of similarities and dissimilarities of the writings on the letter and the envelope on the one hand and the genuine exhibit "E" on the other. No other writings were produced in that connection or were involved or referred to in either the direct examination, which in itself had been detailed in its nature, or in the cross-examination of Thursday. When Bailey took the stand on Monday morning his cross-examination, by the respondent, was resumed in the following words: "Q After—when Mr. Mills came back after being two or three days down there" (the reference was to a visit by Mills to Bailey at Honolulu for the purpose of securing Bailey's examination of the handwritings) "did he bring this letter and card back with him, the writing that you examined?" (In the transcript from which this is copied the court reporter inserted after the word "letter" the note, in parentheses, "Ex. 'G' " and after the word "card" the note, in parentheses, "Ex. 'E.' " While the respondent did not at these points use the words "exhibit 'G' " and "exhibit 'E,' " there can be no doubt that

the reporter was correct in his notation that the letter referred to in the question was exhibit "G" and that the card referred to in the question was exhibit "E.") "A Yes. Q And did you tell him before he left that you would be willing to testify that these were written, those three pieces were written by the same person? A Yes. Q Then did he engage you at that time to come up here? A I don't believe there was any discussion as to whether I was going to testify; he just asked me for my opinion at that time. Q Were arrangements made later? A There were no arrangements made; I received a wire that I was to be subpoenaed." Then followed a brief examination as to the nature and extent of the witness' study and experience as an expert on handwriting, followed still later by cross-examination as to characteristic similarities and dissimilarities in general and similarities and dissimilarities in particular in the handwritings then immediately under consideration. In the midst of this latter cross-examination the respondent said to the clerk of the court: "You got that exhibit there, so that Mr. Bailey may see it?" When this was said the clerk was at his desk and the respondent was standing near the witness and the witness saw and heard what was being said and done. In answer to the question or request the clerk handed to the respondent and the respondent handed to the witness the letter (exhibit "G") and the spurious exhibit "E" which latter at the time was the only exhibit "E" in the possession of the clerk. Upon handing these two papers to the witness the respondent immediately resumed his cross-examination as to the peculiarities of the handwritings, saying to the witness: "Then on the card the 'g' seems to have a characteristic something like this (drawing on blackboard); had you not noticed that?" Lengthy and detailed cross-examination followed, relating to the peculiarities, similarities and dissimilarities of the writings on the letter and

on the spurious exhibit "E." The testimony of the respondent in this court is that his request addressed to the clerk at the point above indicated was for "those papers" or by some similar expression meaning the same thing. The clerk obviously understood the request to be for the two exhibits, the letter and the card. This was natural under the circumstances. While the respondent did not in making his request of the clerk say to him "please give me exhibit 'E' " and while he did not in handing the card to the witness say "this is exhibit 'E,' " the case stands precisely as though that was the language that the respondent used in addressing the clerk and in addressing the witness. The plan had been carefully devised. His express purpose, as he admitted at the hearing in this court in answer to a question by a member of the court, was, in saying what he said and in doing what he did, to deceive the witness into thinking that he was handing him the genuine exhibit "E." The plan devised and followed was well calculated to accomplish that purpose; and succeeded. The respondent first deceived the clerk by failing to return to him, as was his duty, the precise paper (exhibit "E") which he had received from him and for which he had given him a receipt and by the method pursued made the clerk an innocent and unwitting participant in the misrepresentation and deception, to the witness, which followed. When, after a lengthy examination and a lengthy cross-examination upon the handwriting of the letter, the envelope and the genuine card, the clerk, in answer to the cross-examining attorney's request, produced the letter and a card, the witness had a right to believe, and could only believe, that the card was the genuine exhibit "E." The presentation by the respondent to the witness of a card as exhibit "E" was a deliberate misrepresentation. If the representation had been made in words, e. g., "this is exhibit 'E,' " instead of by acts, it would have been a

deliberate falsehood. So, also, forgery of the clerk's signature (by initials), for the purpose of conveying to the witness the clerk's apparent certification of the genuineness of the card, was in itself an offense which cannot be ignored.

There can be no doubt that it was the right and the duty of the respondent, who was entrusted with the defense of two men who were on trial for their lives, to expose if he could what he believed to be a lack of ability and a lack of credibility or accuracy on the part of the witness who had testified as an expert on handwriting; but there was a limitation upon that right and that duty and the limitation was that the test and the exposure must be accomplished by fair and lawful means, free from falsehood and misrepresentation. The so-called "necessities of the case," the keenness of the desire of the attorney to defend the accused to the best of his ability, cannot in our judgment justify falsehood or misrepresentation by the attorney to a witness or to the clerk of the court, whether that falsehood or misrepresentation be expressed in direct language or be conveyed by artful subterfuge. We are unwilling to certify to the younger attorneys who are beginning their experience at the bar of this court, or to any of the attorneys of this Territory, that it is lawful and proper for them to defend men, even though on trial for their lives, by the use of falsehood and misrepresentation, direct or indirect. The conduct of the respondent was unethical and unprofessional.

With reference to the action to be taken in consequence of this finding and this ruling, it is proper to consider the surrounding circumstances. The responsibility of an attorney who is defending men in a capital case is a serious one. Right and justice require that he should be zealous and active in securing all proper evidence in behalf of the

accused and in cross-examining as effectively as may be the witnesses produced by the prosecution. The respondent testifies that when he devised and executed his plan he was not conscious of the fact that it might be deemed unethical or unprofessional. We accept his statement. The two attorneys whom he consulted as to the probable success of the plan did not utter any caution as to its possible impropriety. These are considerations tending towards leniency. As in the *Trask* case, 30 Haw. 736, 754, "a mere gesture of disapproval, however, such as a reprimand, would not suffice." In order to give emphasis to our disapproval of the respondent's conduct, we feel that it is our duty to suspend his license for a brief period of time.

A judgment of suspension for ten days will be signed upon presentation.

*H. R. Hewitt,* Attorney General, and *E. R. McGhee,* Third Deputy Attorney General, in support of the information.

*A. G. M. Robertson* and *N. D. Godbold* for respondent.

### DISSENTING OPINION OF BANKS, J.

Metzger's right to impeach by every proper means Bailey's opinion that the letter, envelope and card were written by the same hand it seems to me must be conceded. Indeed it was not only his right to do this but his duty to do so—his duty to his clients, to the jury and to the court. Of course if he had known that the letter and the envelope were in the handwriting of one of his clients, as he knew that the writing on the card was, the situation would be quite different. Under such circumstances his effort would have been not to destroy what he believed to be false but to destroy what he knew to be true. I think a lawyer, even in his zeal to extricate his client from a

serious position, may not ethically go so far. This, however, was not the case. At the hearing of the instant proceeding Metzger testified that having had considerable experience in chirography he believed that the writing on the card was not by the same person as the writing on the envelope and in the letter. There is no apparent reason for disbelieving him. His purpose therefore was not the evil one of misleading the jury as to a fact which he knew existed but the laudable one of exposing what he believed to be an erroneous opinion. This was in the interest of justice and not against it. Metzger also testified that he had been unable after a long cross-examination of Bailey to discredit his opinion and that there was no other handwriting expert available whom he could consult or to whose opinion he could submit the writings. His only alternative therefore was in some way to lead Bailey to disclose his own fallibility. The question that remains is whether the means he used to accomplish his purpose were unethical.

I do not think that his treatment of the witness was unfair. A cross-examiner is certainly under no professional obligation to warn an expert witness, whose opinion he wishes to test, of the pit which has been dug for him and into which he will fall unless he has sufficient technical learning to discover and avoid it. Nor do I think it a violation of legal ethics to withhold from such witness a fact which, if he knew it, would enable him to discover the pit independently of his technical knowledge. It is a principle peculiar to the cross-examination of expert witnesses that in order to evaluate their opinions things may be assumed as facts which are not facts. This is all that Metzger really did. He in effect assumed, in the presence of the witness, the court and the jury, that the fabricated card was the real exhibit about which the witness had already testified and proceeded to ascertain by cross-exam-

ination whether he was capable of discovering that the assumption was false. In doing this he was entirely fair to the witness. According to his testimony he required Bailey to subject the fabricated card to the same tests to which he had subjected the real exhibit and to compare it with the writing on the envelope and the letter just as he had compared the real exhibit. It was an acid test of the value of Bailey's opinion, but no more severe than that to which a handwriting expert may properly be put.

Under the evidence in this proceeding I likewise see no disregard of legal ethics on Metzger's part in delivering to the clerk the fabricated card instead of the original exhibit, without informing him of the substitution. I think the ethical quality of everything that Metzger did in carrying out the plan he devised for testing the accuracy of Bailey's opinion must be judged by the motive that actuated him to make the test, *unless what he did was otherwise inherently wrong.* His motive in making the test was to discredit an opinion that had been given by a putative expert, which opinion he believed to be erroneous. I see nothing *inherently wrong* in his temporarily withholding from the clerk the fact that the fabricated card which he delivered was not the original exhibit. That he only intended to temporarily withhold this fact from the clerk is shown by Metzger's testimony that when he handed the clerk the simulated card together with two of the exhibits he had withdrawn the clerk said to him, "I will destroy your receipt," and that he told the clerk not to do this because there would be further transactions with respect to these papers. He did in fact return the original exhibit to the clerk after he had concluded his cross-examination of Bailey. His purpose in withholding the fact from the clerk was to guard against the danger of having his plan for testing the value of Bailey's opinion frustrated by a premature exposure. This was not in my opinion a fraud

on the clerk nor was it a fraud on the court nor was it inimical to the cause of justice. It was done not to defeat a fair trial but to promote it. If it had not been done the weakness of Bailey's opinion might not have been revealed and men whom the jury found to be innocent might have been found guilty and sent to the gallows.

I cannot agree that Metzger did anything wrong and I therefore most respectfully dissent from the majority opinion.