## MEGUIRE *v.* CORWINE.

A contract is contrary to public policy, and void, whereby, in consideration of
A.'s procuring B.'s appointment as special counsel in certain causes against
the United States, and aiding him in managing the defence of them, B. agrees
that he will pay A. one-half of the fee which he may receive from the govern-
ment.

ERROR to the Supreme Court of the District of Columbia.
The facts are stated in the opinion of the court.

*Mr. Frederick P. Stanton* for the plaintiff in error.
*Mr. Enoch Totten* for the defendant in error.

MR. JUSTICE SWAYNE delivered the opinion of the court.

The plaintiff in the court below is the plaintiff in error here.

The first count of the declaration avers that in consideration
of the assistance to be rendered by him to the defendants' tes-
tator in procuring him to be appointed special counsel of the
United States in certain litigated cases known as the "Farra-
gut prize cases," and also in consideration of the assistance to
be rendered by the plaintiff in managing and carrying on the
defence in those cases, — which assistance was accordingly ren-
dered, — the testator promised the plaintiff to pay him one-half
of all fees which the testator should receive as such special
counsel, and that the testator did receive as such special coun-
sel in those cases $29,950, of which sum the plaintiff was
entitled to be paid one-half, &c.

The second count is substantially the same with the first,
except that it avers the consideration of the contract to have
been the assistance to be rendered by the plaintiff in the de-
fence of the cases named, and is silent as to the stipulation
that he was to assist in procuring the appointment of the tes-
tator as special counsel for the government.

The third is a common count alleging the indebtedness of
the testator to the defendant for work and labor to the amount
of $12,975.

It appears by the bill of exceptions that the plaintiff called
three witnesses to establish the contract upon which he sought
to recover. Lovel testified that " the testator also stated that

he had agreed to pay the plaintiff one-half of all the fees he should receive in said cases, for his aid in getting the appointment of special counsel and for the assistance which the plaintiff was to render in procuring testimony and giving information for the management of the defence in said cases."

" On cross-examination, the witness said he knew, before his said conversation with R. M. Corwine, and before Corwine was employed, that Mr. Meguire, the plaintiff, had the selection of counsel in said cases, the Treasury Department only restricting him to the selection of a man who was familiar with admiralty practice, and Mr. Meguire was to utilize the information he professed to have at that time. The bargain, as witness understood it, was that in consideration of Meguire's procuring Corwine to be employed as special counsel in those cases, and of assisting him in getting evidence and information, Corwine agreed to pay to the plaintiff (Meguire) one-half of the fees which he (Corwine) might receive from the United States for services in said cases.

" The plaintiff then called Lewis S. Wells, another witness in his behalf, who, being duly sworn, stated that since the commencement of this suit — he thought some time last year — he met the testator (R. M. Corwine, deceased) in the Treasury Department, and had a conversation with him about the plaintiff and the Farragut cases. Mr. Corwine was very angry, and said that he had agreed to pay Mr. Meguire one-half of his fees in the Farragut cases, and had paid him one-half the retainer received in 1869, and $4,000 in July, 1873, and had taken his receipt in full. That he had found out that plaintiff had not been the means of his appointment as special counsel, and he thought he had paid the plaintiff enough."

Wells testified further that upon two occasions the testator told him the plaintiff was assisting him in the preparation of the defence in the Farragut cases, and that he had agreed to pay to the plaintiff one-half of his fees for the plaintiff's services. This is all that is found in the record touching the terms and consideration of the contract. It was in proof by a late solicitor of the treasury that the plaintiff strongly urged on him the employment of the testator as special counsel, and that at the instance of the plaintiff he called the attention of

the Secretary of the Treasury to the subject, and that the appointment of the testator was thus brought about. The plaintiff had been a clerk in New Orleans, in the office of Colonel Holabird, Chief Quartermaster of the Department of the Gulf, during the war, and had possession of Holabird's papers, from which He derived the facts communicated to the testator for the defence of government in the prize suits in question. It was not controverted that the amount of fees received by the testator was $25,950, and that he paid over to the plaintiff $4,475 before the breach occurred between them. The further sum of $8,500 was claimed by the plaintiff, and this suit was brought to recover it. The learned counsel for plaintiff in error complains in his brief that " in the charge of the court, page 10, the jury were instructed that ' the contract set out in the first count of the declaration was illegal and void, and that the plaintiff could not recover on the second count unless the jury should find that the parties made another and a distinct contract;' ' and in the first instruction asked by the defendants and given by the court the jury were told that such an arrangement is void, because it is contrary to public policy, and the plaintiff cannot recover in any form of action for any services rendered or labor performed in pursuance thereof.' . . . ' There can be no doubt that this charge was fatal to the plaintiff's whole case. The jury were not allowed to infer, as they well might have done from the testimony of more than one of the witnesses, that the testator, after his appointment as special counsel, recognized an implied agreement to pay the plaintiff half of his fees for the services of the latter rendered during the progress of the business.' "

In our view of the record this is the turning-point of the case. The objection taken to the instructions referred to is not so much to them in the abstract as the concrete. The complaint is that they closed the door against the inference of another contract which the jury might have drawn from the testimony in the case. To this there are several answers. If there were such testimony, it should have been set forth in the record.. After a careful examination, we have been unable to find any. The instructions expressly saved the right of the jury to find another and a different contract, and their atten-

tion was called to the subject. They found none. The contract objected to by the court as fatally tainted was proved by witnesses called by the plaintiff himself. He neither proved nor attempted to prove any other. It was, then, neither claimed nor intimated that any other had been made. After the views of the court were announced, it was too late for the plaintiff to change his position and claim for the jury the right to wander at large in the field of conjecture and find as a fact what the evidence wholly failed to establish, and which, if found, would have thrown on the court the necessity to set aside the verdict and award a new trial.

A judge has no right to submit a question where the state of the evidence forbids it. *Michigan Bank* v. *Eldred*, 9 Wall. 544. On the contrary, where there is an entire absence of testimony, or it is all one way, and its conclusiveness is free from doubt, it is competent for the court to direct the jury to find accordingly. *Merchants' Bank* v. *State Bank*, 10 id. 604. The practice condemned in *Michigan Bank* v. *Eldred* is fraught with evil. It tends to create doubts which otherwise might not, and ought not to exist, and may confuse the minds of the jury and lead them to wrong conclusions. If the instructions here under consideration are liable to any criticism, it is that they were more favorable to the plaintiff in error than he had a right to claim.

The law touching contracts like the one here in question has been often considered by this court, and is well settled by our adjudications. *Marshall* v. *Baltimore & Ohio Railroad Co.*, 16 How. 314; *Tool Company* v. *Norris*, 2 Wall. 45; *Trist* v. *Child*, 21 id. 441; *Coppell* v. *Hall*, 7 id. 542. It cannot be necessary to go over the same ground again. To do so would be a waste of time. The object of this opinion is rather to vindicate the application of our former rulings to this record than to give them new support. They do not need it. Frauds of the class to which the one here disclosed belongs are an unmixed evil. Whether forbidden by a statute or condemned by public policy, the result is the same. No legal right can spring from such a source. They are the sappers and miners of the public welfare, and of free government as well. The latter depends for its vitality upon the virtue and good faith of

those for whom it exists, and of those by whom it is administered. Corruption is always the forerunner of despotism.

In *Trist* v. *Child* (*supra*), while recognizing the validity of an honest claim for services honestly rendered, this court said: " But they are blended and confused with those which are forbidden : the whole is a unit, and indivisible. That which is bad destroys that which is good, and they perish together. . . . Where the taint exists it affects fatally, in all its parts, the entire body of the contract. In all such cases *potior conditio defendentis.* Where there is turpitude, the law will help neither party." These remarks apply here. The contract is clearly illegal, and this action was brought to enforce it. This conclusion renders it unnecessary to consider the plaintiff's other assignments of error. The case being fundamentally and fatally defective, he could not recover. Conceding all his exceptions, other than those we have considered, to be well taken, the errors committed could have done him no harm, and opposite rulings would have done him no good. In either view, these alleged errors are an immaterial element in the case. *Barth* v. *Clise, Sheriff*, 12 Wall. 400.

*Judgment affirmed.*