In re PETROL TERMINAL
CORP. et al.

In re CALLIS.
No. 10277.

United States District Court,
D. Maryland.
March 31, 1954.

Frank B. Ober, Baltimore, Md., for trustee.

Francis A. Michel, Edgar Allan Poe, Baltimore, Md., for Harry A. Fritsch.

COLEMAN, Chief Judge.

The question before the Court arises upon a petition for review of an order of the Referee in Bankruptcy disallowing the claim of Harry A. Fritsch, in the amount of $146,025. This claim is based upon an employment agreement between Fritsch and Lehigh Valley Oil Company, hereinafter called "Lehigh", a subsidiary of Petrol Terminal Corporation, hereinafter called "Petrol", both of these companies being in reorganization in this Court under Chapter X of the Bankruptcy Act, 11 U.S.C.A. §§ 501–676. A Bankruptcy proceeding was also instituted in this Court against Eugene M. Callis individually, former president of Petrol. He has been adjudicated a bankrupt and his estate is still in process of administration. Fritsch also filed his claim against Callis individually in that proceeding because Callis had assumed personal responsibility for performance of the employment agreement, hereinafter described, between Fritsch and Lehigh. Since the Fritsch claim in each proceeding is based upon the same facts, the question was heard as though

in one case when originally presented to the Referee, and similarly, this Court has treated the two cases as consolidated at the hearing on petition for review of the Referee's order.

After hearing extensive testimony given by the trustee and Fritsch and other officers of Lehigh; and also extensive argument of counsel, the Referee disallowed the Fritsch claim in both proceedings upon findings of fact as set forth in his lengthy written·opinion. At the hearing before this Court counsel for Fritsch stated the net amount of the latter's claim to be $87,700 after proper deductions, including salary paid him by Lehigh and by the trustee for Lehigh in the reorganization proceedings. The following taken from these findings of fact and the pleadings are, we believe, fully substantiated by the testimony and the pleadings before the Referee, and are material in passing upon the petition for review of the Referee's action:

Petrol is the principal stockholder of Lehigh. Eugene M. Callis, bankrupt, is the former president and principal stockholder of Petrol. Lehigh was incorporated under the laws of Delaware in 1922. It had conducted a retail oil distributor's business in the Allentown, Pennsylvania, area from the time of its incorporation, and the claimant, Fritsch, was its president, general manager (in fact if not in title), and principal stockholder until the middle of 1945. He had developed the company. It was his principal source of livelihood. The people who owned a large part of the stock of Lehigh looked to Fritsch for its management. Callis held several hundred shares of Lehigh stock for a number of years prior to 1945, and in the early stages of the War had almost acquired control of Lehigh from Fritsch. After the War he resumed negotiations for control. Fritsch realized that a wartime and post-war economy offered serious problems for a business of this nature. During the War Callis had actively assisted Lehigh in getting oil and, with the approaching end of the War,

Lehigh would need funds for capital expansion and replacement, which were not readily available. Continuing responsibility for Lehigh thus meant more labor for Fritsch. If he were to transfer control of Lehigh to Callis, however, he felt he would be abandoning an assured control of the company, and in consequence an assured livelihood, and subjecting his employment in advancing years to the judgment of another over whom he had no control.

Nevertheless, after extended negotiations, a basic bargain was struck between Fritsch and Callis as follows: Fritsch would accumulate enough stock to transfer control of Lehigh to Callis. In return the stockholders, including Fritsch, would receive a negotiated price for their stock, and Fritsch would receive, in addition to this, an assured income for the next twenty years. Fritsch accordingly got together for transfer to Callis a block of 9,640 shares of Lehigh common stock, out of 13,692 outstanding, and 3,559 shares of $10 preferred, out of 32,654 outstanding. He himself contributed 4,470 shares of common stock to the block. Some of the other stock he bought outright, at the instance of smaller stockholders, and larger stockholders were brought in as actual participants. The latter group included the directors, who contributed 1,959 shares of common to the block. He did not offer all stockholders an opportunity to come into the deal, however, because Callis did not have enough money for this. He dealt instead only with a selected list of friends and relatives whose investments he wished to protect from consequences that might flow from his loss of control.

The stipulated total sale price for this block of stock was $106,874. This was reached by adding together the cost to Fritsch of the stock he had bought, and the agreed price of the larger units, including his own. Fritsch himself received no more per share for the third of the common that he gave up than did any other common stockholder for the shares that he sold, and he made no

charge for his services in accumulating the block necessary for control. Callis agreed to pay the above price for the stock, which gave him control of Lehigh, $28,328 down and the rest spread over four annual payments. Pending payment of the full purchase price, the stock was to be held in escrow by The Allentown National Bank, to be released to Callis proportionately as he met the purchase payments. Meanwhile Callis was to have the right to vote the stock, and to assign it. All of the foregoing was set forth in a formal written Agreement between Fritsch and Callis, dated August 8, 1945.

To accomplish the assurance of income to Fritsch in the above described agreement for effecting transfer of control of Lehigh to Callis, and in consideration of the promises therein contained, Callis agreed to cause Lehigh to enter into an employment contract with Fritsch which would extend over a period of 20 years. Under this contract Lehigh was to employ Fritsch "as Manager, or Assistant Manager, of its business, or in some other executive capacity," at an annual salary of $7,450 (the same salary he was then receiving from Lehigh) for the first 10 years and $6,000 for the second 10 years. In addition Fritsch was to have an expense allowance of approximately $150 per month. In the event of incapacity of Fritsch for more than 60 days, Lehigh was to pay Fritsch one-half of his salary for the period of incapacity beyond 60 days, the total period of such half payments not to exceed 5 years in the aggregate during the life of the contract. In addition, Callis further agreed to cause his stock in Lehigh to be voted to elect Fritsch a director, if Fritsch so desired, so long as Fritsch was employed under the 20 year agreement.

To secure payment to Fritsch of the aforegoing employment compensation, Callis further agreed in the same instrument to cause Lehigh to take out life insurance upon his, Callis', life in the total amount of $75,000 payable upon Callis' death to the Allentown National Bank, hereinafter called the "Bank", Callis to pay the premiums on the policies, which were to be assigned to the Bank as escrow agent under an agreement whereby the Bank would hold them to secure the payment of the annual compensation to Callis; and in the event that Lehigh defaulted on the employment contract during Callis' life time, Callis assumed personal responsibility for payment of the annual sums. If both Lehigh and Callis defaulted, the Bank, as escrow agent, was to borrow on the policies to meet the salary payments when due. After Callis' death the Bank was to hold the proceeds of the policies and to use them to make the contracted payments to Fritsch.

Contemporaneously with the agreement above set forth between Callis and Fritsch, two other agreements, as follows, were entered into, to effectuate that agreement: (1) agreement between Lehigh and Fritsch, under which Lehigh obligated itself as Callis had agreed that it should do, namely, to employ Fritsch on the terms set forth in the agreement between Callis and Fritsch; and to procure and maintain the insurance on Callis' life pursuant to a contemporaneous agreement between Callis, Fritsch, Lehigh and the Bank; Fritsch in turn agreed to serve the company in whichever of the described capacities the company might prefer, and he further agreed not to compete with it so long as he was employed by it. (2) The agreement referred to between Callis, Lehigh, Fritsch and the Bank, whereby the Bank, as escrow agent, agreed to hold the stock of Lehigh Valley purchased by him as stipulated in the agreement. The Bank also agreed, as escrow agent, to hold the policies of insurance upon the life of Callis as security for the compensation to be paid Fritsch, all as set forth in detail in the other two contemporaneous agreements hereinbefore described.

A special meeting of the board of directors of Lehigh, consisting of five members including Fritsch, was then called for August 8, 1945, at which the

transaction between Fritsch and Callis was discussed, the employment contract and escrow agreement were formally adopted, and the purchase of the life insurance to secure that contract was ordered. The three contracts described were then executed simultaneously. At the same time Fritsch took over, at its cash surrender value, an insurance policy which Lehigh held on his life, and surrendered to the company 409 shares of preferred stock for miscellaneous incidental assets of the company.

The resolution adopted by the board of directors, all of whom were participating in the sale of stock to Callis, recited that the execution of the employment contract with Fritsch was beneficial to the Company. It was voted to continue Fritsch's compensation at the same rate as before the transfer for the next ten years, and then at the reduced rate for the succeeding ten years.

The first meeting of the board of directors of Lehigh held after the execution of the three agreements of August 8, 1945, just described, was on August 21, 1945, when the board was increased from five to seven members, Callis and Miss Ethel Hurst being added to fill two existing vacancies. Thereafter $75,000 of life insurance, purchased on Callis' life by Lehigh, was assigned to the Bank in accordance with the escrow agreement of August 8, 1945.

There was no stockholders' meeting of Lehigh held after the execution of the three agreements of August 8, 1945, until the annual meeting on March 11, 1946. The notice of this meeting gave no indication that these agreements would be then considered. It merely stated that the meeting would take place on March 11, "for the purposes of electing a board of directors and receiving and acting upon the report of the officers, and for the transaction of such other business as may properly come before the meeting." The proxy which accompanied the notice was a blanket proxy to Fritsch, with no place for instruction on the question of the Fritsch-Callis agreement, nor any reference to any other specific business that might be expected to come before the meeting.

At this stockholders' meeting on March 11, 1946, holders of a total of 10,886 shares were represented. 2 shareholders were present in person,—Fritsch, as owner of 14 shares, and E. E. Oplinger, a director of the company throughout the period here considered, as owner of 2 shares. The remaining 10,870 shares were all represented by the blanket proxy to Fritsch, which included 9,943 shares in the name of Callis.

In his written report given at this meeting, Fritsch, as president, reported that Callis had acquired a considerable portion of the stock of the company and that he had been added to the board of directors. He referred orally to the matter of the Fritsch-Callis agreement, and the two other related agreements, hereinbefore described, and the minutes of the directors' meetings dealing with those transactions were read and approved by the holders of 10,870 shares voted through proxies to Fritsch, and by Oplinger and Fritsch, the holders of the remaining 16 shares.

While Lehigh was solvent when the transfer to Callis of control of the company took place in 1945, Callis thereafter led it into financial disaster, until the company was brought into the Bankruptcy Court, first, separately in Pennsylvania, then in this Court. While it is not shown that any of Lehigh's present creditors were also creditors when Lehigh made the employment agreement of August 8, 1945, with Fritsch, since it appears that creditors' claims against Lehigh are now over $700,000, and since the company had been successful until a few years ago, the company must have had a substantial indebtedness in 1945. Prior to the bankruptcy proceedings Fritsch had been a director of Lehigh and also its president, first in complete charge, and later only in charge of finances until he was made chairman of the Board in March, 1951, one Haller succeeding him as president. Lake, as trustee in the proceedings in this Court,

continued to employ Fritsch, but with greatly reduced authority and compensation, until in September, 1952, the trustee notified him, in writing, of the termination of his employment effective October 1, 1952.

The Bankruptcy Act provides, Section 70, sub. b, 11 U.S.C.A. § 110, sub. b, that "Within sixty days after the adjudication, the trustee shall assume or reject any executory contract, including unexpired leases of real property: Provided, however, That the court may for cause shown extend or reduce such period of time. Any such contract or lease not assumed or rejected within such time, whether or not a trustee has been appointed or has qualified, shall be deemed to be rejected." It is clear from the record in the present case, and indeed conceded by counsel for Fritsch, that the trustee never assumed or intended to assume the contract of employment of August 8, 1945, between Fritsch and Lehigh, the employment of Fritsch by the trustee being on an entirely different and temporary basis. Nor did the trustee ever officially reject the Fritsch-Lehigh agreement. Therefore, by the express terms of Section 70, sub. b, it must be deemed to have been rejected.

On the aforegoing facts the Referee held first, with respect to the claim of Fritsch in the bankruptcy proceeding against Callis individually, that the agreement between Fritsch and Callis was void as against public policy, and he therefore disallowed Fritsch's claim. The Referee thus summarized the reason for his conclusion: "Under the established law, the contract which creates a possible choice between avoidance of personal liability and the best interests of the company is void as against public policy. It does not matter how the personal liability may arise; the existence of the possible conflict between personal and fiduciary interest is the critical factor. * * *. It follows that the contract between Fritsch and Callis as to employment upon which Mr. Fritsch's claim is based, is void as against public policy. If the contract is void, no claim can arise from it which is allowable in bankruptcy; the claim of Mr. Fritsch in the individual bankruptcy therefore cannot be allowed."

The Referee based his conclusion primarily upon West v. Camden, 135 U.S. 507, 10 S.Ct. 838, 34 L.Ed. 254. There the defendant, as trustee for Standard Oil Company, held more than five-sixths of the stock in a new corporation, the Baltimore United Oil Company, which had bought the refinery and business of a partnership in which West, the plaintiff, had an interest. Part of the consideration for the purchase was a promise by Camden that he would cause United to give West permanent employment as a vice-president of United, West relying upon this promise because Camden, as trustee, had control of United. When United terminated West's employment, West sued Camden. There was no contract directly with United to employ West, nor was Camden's agreement with West known to all stockholders of United.

The case was heard before a jury in the lower court (then the United States Circuit Court for the District of Maryland) and reached the Supreme Court, 135 U.S. 507, 10 S.Ct. 838, 840, on writ of error involving the correctness of the lower Court's instructions to the jury, among which was the following, to which the plaintiff excepted: " 'If they [the jury] find that the alleged contract between the plaintiff and the defendant, that the said plaintiff should have permanent employment as an officer of the Baltimore United Oil Company, at a salary of not less than $5000 a year, or as much as any other officer of said company received, was made in contemplation that the defendant was to be an officer of said company and to control a majority of its stock, and that, by the use of his official position and of the control of said ownership of stock, he was to retain said plaintiff in office and fix his salary, as admitted by the said plaintiff, then their verdict must be for the defendant upon the issues joined in this case.' "

A verdict and judgment in the lower Court for the defendant was affirmed by the Supreme Court, which found the above quoted instruction of the lower Court to the jury to have been correct. In its opinion the Supreme Court said, 135 U.S. 520–521, 10 S.Ct. 841:

"We think that under no circumstances could the plaintiff recover in this action, for the reason that the alleged contract was void as against public policy, and that the first instruction to the jury was correct. From the plaintiff's own testimony it appears that his only reliance was on the use of the defendant's influence as an officer of the Baltimore United Oil Company, and on his control over the stock in that company held by the Standard Oil Company. The plaintiff says of the defendant: 'He was to be president of the company, and I supposed he would remain there, and continue me and keep me in the position as vice-president and general manager. If he was to be president, and hold five-sixths of the stock, and continue to hold it, it was a surety that I should remain in the position.' The agreement alleged to have been made was one on the part of the defendant, whereby he might be required to act contrary to the duty which, as an officer of the Baltimore United Oil Company, he owed to that company and to the stockholders other than the plaintiff. The same rule which is applicable to the case of a public office applies to the present case, although it does not appear that the defendant was to receive direct personal pecuniary compensation or gain for what he was to do. The plaintiff, on his own showing, dealt with the defendant in reference to the fiduciary relation which the latter bore to the stockholders, both of the Standard Oil Company and of the Baltimore United Oil Company. The agreement alleged was an agreement which bound the defendant as to his future action as a director of the Baltimore United Oil Company, and an agreement to keep the plaintiff permanently in the position of vice-president of that company, irrespective of its interests. It amounted to a stipulation on the part of the defendant that no contingency should happen which should require a change of management and a reduction of expenses. The principle involved is well settled in regard to public employments. Meguire v. Corwine, 101 U.S. 108, 111 [25 L.Ed. 899]; Oscanyan v. Arms Co., 103 U.S. 261, 272, 273 [26 L. Ed. 539]. The same doctrine has been applied to the directors of a private corporation, charged with duties of a fiduciary character to private parties, on the view that it is public policy to secure fidelity in the discharge of such duties. Wardell v. Railroad Co. [103 U.S.] 651, 658 [26 L.Ed. 509]; Woodstock Iron Co. v. [Richmond & D] Extension Co., 129 U.S. 643, 9 S.Ct. 402 [32 L.Ed. 819], and cases there cited, especially Fuller v. Dame, 18 Pick. 472, 483. See, also, Guernsey v. Cook, 120 Mass. 501, and Woodruff v. Wentworth, 133 Mass. 309, 314.

"We think this principle is equally applicable, on the ground of public policy, although there was not to be any direct private gain to the defendant; for, as was said by the circuit court in this case, it was the right of the other stockholders in the Baltimore United Oil Company 'to have the defendant's judgment, as an officer of the company, exercised with a sole regard to the interests of the company.' A personal liability for damages on the part of the defendant, in case the plaintiff should be removed after an agreement of the character alleged, was calculated to be a strong incentive to the defendant to act contrary to the true interests of the company and of its other stockholders. Bliss v. Matteson, 45 N.Y. 22; 1 Mor. Priv. Corp. §§ 516, 519."

Secondly, as respects Fritsch's claim under his agreement with Lehigh, the Referee disallowed this claim also, but not on the ground that it was "necessarily void, either for illegality or because ultra vires," as the trustee maintained, but because it was voidable, and had been legally voided by operation of law under Section 70, sub. b, of the

Bankruptcy Act when the Referee failed within the prescribed sixty day period either to assume or reject it. The Referee explained as follows the reasons for his conclusion: "The evidence reviewed above establishes the fact that the employment contract with Fritsch was made and ratified by individuals who had a fiduciary obligation to the corporation and who also had a personal interest in the making of the contract. It was Mr. Fritsch's insistence on the contract as his price for transferring control that forced them into the position of having to make the choice. Such being the case the burden shifts to Mr. Fritsch to demonstrate that the contract was fair and equitable to the corporation.

"This burden Mr. Fritsch has failed to meet. The employment contract was a sine qua non to the sale of his stock and his assistance to Callis in effecting the transfer of control to Callis. As stated above, his price was an assured income which was accomplished by the employment contract and by the security of the insurance which accompanied it. It thrust the burden of paying his price on the corporation itself, rather than the beneficiary of the transfer, and thereby caused its payment not only by the purchaser but also by the innocent stockholders who had never been informed of what was transpiring, much less having been invited to participate in the benefits to the corporation of Mr. Fritsch's continuing association with it; the terms of the contract, both with respect to salary and especially with respect to term, bore no justifiable relation to the benefits which were expected to ensue.

"The disability provision was most unusual, but in addition the contract was secured, so that Mr. Fritsch would be protected regardless of his usefulness to the corporation. It is inconceivable that there is any justification for a corporation, at any time or at any place, to buy with corporate funds, and maintain with corporate funds, life insurance on one individual to secure the contract of another individual merely because the first individual was personally responsible for performance by the corporation of a contract with the second individual extending over a period of twenty years. For directors or stockholders to be a party to such an arrangement is as gross a breach of fiduciary duty and misuse of corporate funds as this Court expects ever to observe. The whole arrangement, including the employment contract, is a clear case of oppression of minority shareholders, if not actual fraud.

"It follows that the employment contract on which Mr. Fritsch's claim is based, is a voidable contract, and since the trustee, as the representative of the corporation, has voided it by his rejection of its terms, the claim of Mr. Fritsch under the employment contract shall not be allowed."

The Referee in support of his conclusion cited, among other cases, Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L. Ed. 281, to which we will again refer later in this opinion.

The position taken by the trustee, first as respects Fritsch's claim against Callis, is the same as that of the Referee, i. e. that this claim is invalid as against public policy because based on Lehigh's agreement to continue to employ Fritsch, regardless of his competency and the interest of Lehigh's stockholders. Secondly, as respects Fritsch's claim against Lehigh, it was argued on behalf of the trustee that the ground on which the Referee based his disallowance of Fritsch's claim was sufficient, but the additional ground was asserted before both the Referee and this Court that Fritsch's contract of employment by Lehigh was ultra vires the directors of that corporation; that they had clearly violated their fiduciary duty to other shareholders and therefore the agreement was void because against public policy under the rule laid down in West v. Camden, supra.

Coming to the grounds on which Fritsch seeks to support his claim against both Callis individually and the corporation, it is asserted that the steps embodied in the three agreements,

whereby his employment by Lehigh was effected, were fair and reasonable; that he had organized Lehigh with several associates in 1922; had been its president ever since, until the reorganization proceedings began in this Court; that the prosperity of Lehigh was mainly due to him and his efforts; that his agreed salary of $7,450 for the first ten years was the same as his salary at the time the agreements were entered into, when he was fifty years old, in the prime of life and in good health; that for the second ten years his agreed salary of $6,000 represented a reduction of twenty per cent over a period during which, in ordinary course, there would be no real diminution of his activity and business ability; that the price offered Fritsch for his stock was not in excess of its value; that Fritsch was not anxious to sell, and that he was only willing to do so if assured of the continuance of his connection with Lehigh in some executive position at the same salary he was then receiving, and which he had every reason to believe he would otherwise continue to receive for twenty years, if he lived that long, without disposing of his stock.

It is further asserted on behalf of Fritsch that it was distinctly to the interest of Lehigh that he should not sever his connection with it, sell his stock to some outside interest, or engage in a competing business. The agreements in issue assured against this. It is claimed that the agreements were also beneficial to Lehigh for the further reason that they not only tied Fritsch to Lehigh, notwithstanding the sale of his stock to Callis, but they also brought Callis into the company with four directors other than Fritsch, who gave promise of being of additional value to Lehigh; that the provisions in the employment agreement, fixing Fritsch's compensation and its duration should he become incapacitated for a period of more than sixty days, in which event his salary would be reduced one-half, are not unreasonable in view of Fritsch's long and beneficial service to the company which he had founded

and developed; that his incapacity was not likely to arise except from unusual accident or illness, in either of which events the compensation provided would be justified, being in the nature of a reasonable pension; and that an expense account, as provided, of approximately $150 a month was a sum reasonably chargeable to the company for Fritsch's carrying on the same duties that he had been accustomed to perform in the past, the expense of which the company had been paying.

For the foregoing reasons it is maintained that the contract of employment was one within the power of the board of directors of Lehigh to make, and was binding on Lehigh without any approval and ratification at a subsequent stockholders' meeting, although the agreement was ratified and approved at the first annual meeting of stockholders held after the making of the agreement, by a vote of a majority of the shares of the company, at which meeting all three agreements were ratified, they having been read, approved and adopted at a previous meeting of the board of directors held on August 8, 1945; that while at the stockholders' meeting only two stockholders were present in person, one of them being Fritsch himself, nevertheless, 10,870 shares of stock were in fact voted through duly authorized proxies given to Fritsch; that due notice of this annual meeting had been given by the secretary of the company, stating that the purpose of the meeting was the election of a board of directors; the receiving and acting upon the report of the officers, and for the transaction of such other business as may properly come before the meeting; that no requests or solicitations for proxies were made, but a form of proxy was enclosed with the notice of this meeting, and that since the meeting thus called was to be an annual one, and the notice given was that among other purposes of the meeting was the transaction of such other business as may properly come before it, no further specification was necessary, and that the authority conferred

by the proxies, as given, was binding upon their makers in the absence of proof of fraud or bad faith.

The fact is also stressed that for six years after the making of the contract of employment, it was acted upon by the company without any complaint on the part of any stockholder. Further, it is asserted that the four directors, other than Fritsch, who authorized the agreement for his employment and who each sold all but two shares of their common stock as part of the bargain, were motivated not merely by friendship for Fritsch, but by an honest belief that the company would be strengthened by the addition of Callis as a large stockholder and director, and by securing the services of Fritsch for a long period on reasonable terms, thus eliminating him as a possible competitor of the company.

On behalf of Fritsch special reliance is placed upon In re American Range & Foundry Co., D.C., 22 F.2d 558. There a father and son by the name of Nye owned substantially all the stock of two solvent corporations, the business of which had been built up by the father and was known as the Nye Stove Works. The father turned over his stock to the son and the two corporations through the Nyes as their directors entered into an agreement to employ the father for ten years, at an annual salary of $10,000, each company to pay one half. The father in time agreed not to promote or aid any competing business. Later on one of the companies bought out the other which continued to employ the father for several years, as agreed, until it became bankrupt. The father filed a claim against the company in the bankruptcy proceedings, on the theory that his executory contract was breached by the adjudication in bankruptcy. The referee allowed him the present worth of future payments to become due under his contract, less what it was estimated he could earn, he then being over 70 years of age. The trustee claimed that the contract was void because fraudulent and without consideration; that the bankruptcy had terminated it and that

it had been abandoned. The Court confirmed the Referee's order, and said in the course of its opinion, 22 F.2d at page 559: "There is nothing to indicate fraud in the inception of the contract. The companies were solvent; they had a right to do with their money as they saw fit, and to enter into such obligations as they saw fit, so long as they acted honestly towards those then interested as creditors or stockholders. There was no concealment at any time of the fact that the contract had been made, and there was no intention, when it was made, to defraud persons who might subsequently become creditors. Undoubtedly, the Nyes, who were the persons most interested at that time, felt, when that contract was made, that the companies would be more successful in the future than they had been in the past, and there was nothing then to indicate any danger of insolvency.

"The fact that G. L. Nye was a director, and in a sense made the contract with himself, is not enough, standing alone, to avoid the contract. He and his son owned the business, and no one else at that time had any substantial interest in it. If the business had not fallen upon evil days, the contract would undoubtedly have been carried out by the corporation. As a matter of fact, it accepted such services as he rendered for it, and paid him his salary for several years, thereby ratifying and confirming the contract. There seems to be no justification for holding the contract either void or abandoned."

It is obvious that the facts involved in the Nye contract are not similar to those involved in Lehigh's contract to employ Fritsch. The differences are numerous and distinct. For example, in the Nye contract there was nothing corresponding to the character of the sale of stock to Callis which indicated that the contract for Fritsch's employment really represented part payment to Fritsch and others of the purchase price of the stock, and was not a bona fide employment contract. Also, in the Nye case, father and son owned, for all prac-

tical purposes, the business. As the Court said, 22 F.2d at page 559, "In practical effect, the Nyes were the companies and the companies were the Nyes." Thus the Court in effect disregarded the corporate entity because of family ownership, which is nonexistent here.

We believe that none of the arguments as above set forth, advanced by counsel for Fritsch, are sufficient to overcome the fact that the express purpose set forth in the agreement which Fritsch made with Callis, and in the supporting agreement which he made with Lehigh, was to place his and Callis' own interests in opposition to the minority stockholders of Lehigh, who had not assented to these agreements, and that therefore they are both contrary to public policy and void. The Referee so held with respect to the contract between Fritsch and Callis. However, he held that the contract between Fritsch and Lehigh was not per se void, but voidable, and that the burden had shifted to Fritsch to prove that the agreement was not voidable, but that Fritsch had failed to meet this burden. We, however, fail to find that the two contracts can be differentiated insofar as the public policy rule applies. They are inter-acting. The underlying purpose of both is the same, and the rule laid down in West v. Camden, supra, is equally applicable to both. The decision of the Supreme Court upon which the Referee appears to have relied in considering the contract with Lehigh, namely, Pepper v. Litton, supra, is not, we think, to be treated as modifying the rule of West v. Camden, supra, when applied to the agreement with Lehigh. In the Pepper case the Supreme Court explained that the Bankruptcy Court was exercising its equitable powers in passing upon the status of a judgment claim of an officer of a bankrupt corporation, in relation to the claims of other creditors,—a state of facts quite different from that before us.

The gist of the rule laid down in West v. Camden, supra, is that any agreement between some of the stockholders of a company, particularly where they own a majority of the stock, which binds them to vote for certain officers or directors, or for themselves, at a stated salary or for certain compensation, without due regard to what may be for the best interests of the company; or any agreement by which they otherwise place their own interests in opposition to the interests of the company, since this tends to the perpetration of a fraud upon the minority stockholders, is contrary to public policy and void.

This rule of public policy that forbids an action for damages for breach of an agreement found to be against public policy is not based on the impropriety of compelling the defendant to pay damages, but is based upon the fact that the plaintiff is himself a wrongdoer, or that the transaction is declared absolutely void by law. The rule is stated in Williston on Contracts, Revised Edition, Volume 6, Section 1736 as follows: "The officers and even shareholders of a private corporation are under certain duties to it and often to the public, which must not be made the subject of bargain. A bargain by a large shareholder or group of shareholders for consideration inuring to them personally, to procure the appointment of another as an officer of the corporation or to use their votes to keep the control in certain hands is invalid. * * * But 'it is not illegal or against public policy for two or more stockholders owning the majority of the shares of stock to unite upon a course of corporate policy or action, or upon the officers whom they will elect. An ordinary agreement among a minority in number, but a majority in shares, for the purpose of obtaining control of the corporation by the election of particular persons as directors is not illegal. Shareholders have the right to combine their interests and voting powers to secure such control of the corporation, and the adoption of and adhesion by it to a specific policy and course of business. Agreements upon a sufficient consideration between them, of such intendment and effect, are valid and

binding, if they do not contravene any express charter or statutory provision or contemplate any fraud, oppression, or wrong against other stockholders, or other illegal object.' Manson v. Curtis, 223 N.Y. 313, 119 N.E. 559. But a bargain to vote for corporate action in consideration of other private advantage than that which might accrue to the promisor from the benefit to the corporation from taking the action is invalid. Every director owes a duty to the state, to the corporation, and to the general body of shareholders to exercise individually his best and impartial judgment on behalf of the corporation. Any bargain which prevents him from performing this duty, is against public policy and void, although there is no wrongful intent and no actual harm to the corporation. This is true also of every shareholder when acting in his corporate capacity as a shareholder."

The rule is thus stated in the Restatement of the Law of Contracts, Section 569: "Bargain by an official or shareholder of a corporation for a consideration inuring to him personally to exercise, or promise to exercise, his powers in the management of the corporation in a particular way, is illegal." Corbin on Contracts,—a rather recent treatise—thus deals with the same subject (Volume 6, Section 1454): "The directors of a corporation are the persons to whom is committed the control of its affairs. It is one of their proper functions, when acting as a board, to make contracts with employees and officers and for other ordinary corporate purposes. It is illegal, however, for one or more directors, acting for themselves and not for the corporation, to bargain away their discretion by promising to vote in a specified manner. So a bargain by a director that another shall be made or retained an officer of the company, or that a dividend will be declared, or that he will vote as directed by another, is illegal.

"A shareholder in a corporation is not a managing agent; but he has a voting power in the exercise of which he owes a duty to other shareholders. It is much the same as the duty that a voting citizen owes to other citizens. While it is proper for a number of shareholders to act together in the election of officers so as to control corporate affairs or even to create a voting trust by transferring their shares to a committee or trustee with full discretionary power, it is illegal for a shareholder to bargain away his discretion as a voter, to the effect that a certain one shall be elected or retained as an officer, that corporate property shall be bought or sold, that the corporation will make a loan, that salaries shall not be reduced, or that he will vote as directed by another.

"Bargains by shareholders such as those enumerated are not illegal if all the shareholders of the corporation are consenting parties, assuming that the transaction is not in fraud of creditors."

The above statements of Corbin are supported by many authorities, as are the statements in Williston above. It seems unnecessary in this opinion to labor the point further, in view of the decision in West v. Camden, supra. Suffice it, therefore, to refer specifically to one or two of the more recent State Court decisions which have applied the same rule. For example, Odman v. Oleson, 319 Mass. 24, 64 N.E.2d 439, involved a contract made by all but one stockholder of a company, to vote in favor of an elaborate program set forth in the contract, including provision that two of the stockholders (both parties to the contract) were to be among the four directors, and plaintiff, also a stockholder, was to be clerk, vice president and assistant treasurer of the company, at an annual salary of $9,360, and the rights of the parties were to continue as long as they should remain connected with the company. Plaintiff was put in the several offices, was afterwards displaced, was not paid the promised salary, and he alleged he was otherwise injured by fraud on the part of the defendant stockholders. The Court held plaintiff could not recover because the contract was void

as against public policy for these reasons: (1) There was one stockholder not a party to the contract who might be injuriously affected by it. (2) The contract was not restricted as to time. (3) The contract purported to control the conduct of some of the parties as directors, in which capacity they were fiduciaries of the corporation, and not merely to control their conduct as stockholders. (4) The contract took away from stockholders freedom to use their judgment as to the best interests of the corporation, and so was void because against public policy, even though a stockholder is not generally a fiduciary in his relations to the corporation.

In Dubbs v. Kramer, 302 Pa. 455, 153 A. 733, plaintiff, who was a minority-stockholder, director and vice president of a corporation, entered into a written agreement with a majority-stockholder who was the company secretary-treasurer and also a director, that the latter obligated himself to vote at a meeting of the board of directors a salary of $5,-200 a year to plaintiff for five years, which was not to be reduced except by reason of the corporation's inability to pay. Defendant repudiated the agreement and no meeting of directors was held to put it into effect. The Court held the contract void as against public policy,—that it is the duty of a director to deal with affairs of the corporation at meetings of the board; that he cannot lawfully contract as to how he will vote, and that therefore a contract is against public policy that restricts him in the free exercise of his discretion or judgment.

We have been referred to no Maryland decision which is contrary to the principle which we believe controls in the present case, and which has been laid down by the Supreme Court, lower federal Courts, and State Courts generally. Other cases have no direct bearing upon the issues here presented that announce the rule that a stockholder is without standing to complain of improper acts or management of officers, directors or stockholders of a corporation where such occurred prior to the time that the complainant became a stockholder. Here, the trustee in Bankruptcy is a representative of all *creditors* of the Bankruptcy estate, and it is his duty to protect their interests, as they may appear, apart from the time when they may have become creditors.

The facts in Francis v. Brigham-Hopkins Co., 108 Md. 233, 70 A. 95 upon which reliance is placed by counsel for Fritsch are distinctly different. There the salaries of certain officers of a corporation which were fixed by its board of directors were the subject of attack by a stockholder on the ground that they were excessive. The Court held otherwise, even though one of the officers whose salary was involved was a director and was present at the meeting at which his salary was voted, and in fact his presence completed a quorum necessary for the meeting. The Court held that the directors had acted within the powers lawfully delegated to them, and that no improper advantage had been taken of the stockholders.

Also we find nothing in McQuillen v. National Cash Register Co., 4 Cir., 112 F.2d 877, contrary to the conclusion which we have reached. In that case it was found that what the directors of a corporation did was not in conflict with the best interests of the stockholders; that they had acted in good faith in fixing salaries and incurring other expenses, and that therefore their judgment should not be upset even though it might appear to have been unwise or mistaken. The decision in the McQuillen case is that while courts cannot condone, on the part of those in control of a corporation, either bad faith, neglect, or indifference to the rights of stockholders, nevertheless, much must be entrusted to the discretion of corporate directors, and that courts should intervene only in cases where abuse of discretion is clear. In that case neither the amount of salary voted a corporation's official nor the length of his term of employment, was the test, in and of itself. The same is true in the present case.

Finally, reference should be made to the third agreement, i. e. the one between Callis, Lehigh, Fritsch and the Bank. The Referee was not called upon to consider this agreement, nor do we feel that we should do so at this time, since the facts relative to the status and rights of the parties have not been fully disclosed. Accordingly, a decision on this point will be reserved pending such further hearing as may be necessary.

The Referee's findings of fact and conclusions of law are affirmed.