LUCERO, Circuit Judge,
dissenting.
Because the majority’s decision can not be squared with a clear reading of 41 U.S.C. § 254(a), and because I am concerned with the majority’s summary dismissal of ABGI’s challenge to the arrangement’s legakty, I respectfuky dissent. Contrary to the majority, I conclude that *834 the record before us adequately demonstrates the illegality of the parties’ agreement and thus would reach and consider the question of the legality of contingent fee arrangements with selling agents to obtain government contracts. On my review of the record, I conclude there was no legally sufficient evidentiary basis for the jury to find that McCurdy Group fell under § 254(a)’s exception for bona fide established selling agencies as the exception traditionally has been understood.
I
A. Judicial Beginnings
The broad and long-standing policy against contingent fees was articulated by the Supreme Court in Providence Tool Co. v. Norris, 69 U.S. (2 Wall.) 45, 54-56, 17 L.Ed. 868 (1864). The prohibition promoted efficiency by preventing the use of personal influence in obtaining public contracts; in the Court’s view, the rule was fundamental to good government.[1] According to the Court’s precedent, it was irrelevant that improper influence was not exerted in a given case, for “ ‘[t]he objection to [contingent fee arrangements] rests in their tendency, not in what was done in the particular ease.... The court will not inquire what was done. If that should be improper it probably would be hidden, and would not appear.’ ” United States v. Miss. Valley Generating Co., 364 U.S. 520, 550 n. 14, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961) (quoting Hazelton v. Sheckels, 202 U.S. 71, 79, 26 S.Ct. 567, 50 L.Ed. 939 (1906)).
The exception for established commercial or selling agencies maintained by the contractor for the purpose of securing business was first recognized in Oscanyan v. Arms Co., which distinguished “contingent compensation in the obnoxious sense of that term” from “rates established by merchants for legitimate services in the regular course of business” — in other words, “the ordinary brokerage commission.” 103 U.S. 261, 276, 26 L.Ed. 539 (1880). The exception was a narrow one and applied only to contingent fees “allowed by established custom of commission merchants and brokers.”[2] Id.
*835 B. Executive Actions
Covenants against contingent fees were included in government procurement contracts as a matter of course beginning in World War I .[3] At the start of World War II, Executive Order 9001 required that all military procurement contracts include a warranty that the contractor “has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage, or contingent fee.” Exec. Order No. 9001, 1941 U.S.Code Cong.Serv. 992, 994 (Dec. 27, 1941). Excepted from the Order’s warranty requirement were “commissions payable by contractors upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business.” Id.
The Executive Order’s prohibition and its exception broke no new ground. Its purpose was plain: “it reflected] the public policy long enunciated by the courts, and add[ed] to it a thrust comparable to that of statutory law.” Le John Mfg. Co. v. Webb, 222 F.2d 48, 50 (D.C.Cir.1955); United States v. Paddock, 178 F.2d 394, 396 (5th Cir.1949) (“Executive Order No. 9001 was a declaration of public policy, and its purpose was to preserve the contractual integrity of the United States.”).
In interpreting the exception to the warranty requirement, courts properly focused on its purpose and plain language. See Reynolds v. Goodwin-Hill Corp., 154 F.2d 553, 555 (2d Cir.1946) (L.Hand, J.); see also Paddock, 178 F.2d at 395-96. As
the Second Circuit put it, the exception for “bona fide commercial or selling agencies maintained by the contractor for the purpose of securing business” created a “privileged class who may receive contingent fees for securing government contracts, while others may not.” Bradley v. Am. Radiator & Standard Sanitary Corp., 159 F.2d 39, 40, 41 (2d Cir.1947) (per curiam). “Not only should grants of special privileges be jealously restricted, but such a restriction is also in the interest of maintaining the integrity of governmental contracting procedure.” Id. at 41.
C. Congressional Enactment
Congress made the prohibition on contingent fees a matter of statutory law with the passage of the Armed Services Procurement Act of 1947, ch. 65, § 4, 1947 U.S.Code Cong.Serv. 20, 22, and the Federal Property and Administrative Services Act of 1949, ch. 288, § 304(a), 1949 U.S.Code Cong.Serv. 372, 388-89. Pursuant to the latter enactment, 41 U.S.C. § 254(a) states:
Every contract awarded after using procedures other than sealed-bid procedures shall contain a suitable warranty, as determined by the agency head, by the contractor that no person or selling agency has been employed or retained to solicit or secure such contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the *836 contractor for the purpose of securing business....
The Congressional Reports on the Federal Property and Administrative Services Act are mostly silent regarding the propriety of contingent fees. However, it is noteworthy that § 254(a) was enacted against the backdrop of a late 1940s Congressional investigation of the unlawful activities of “five-percenters” and “influence peddlers.”[4] A resulting Senate Report concluded that the “modus operand! of these individuals differed, but basically they had one thing in common — the commodity they had for sale was collusion with Government officials. The mere existence of such a condition tends to destroy good government.” S.Rep. No. 81-1232, at 1 (1950). Based on the Congressional investigation, the report listed a number of tests that were considered relevant in distinguishing “bona fide representatives” from “influence peddlers.”[5]
D. Regulatory Gloss
Federal regulations issued pursuant to the Federal Property and Administrative Services Act give meaning to the exception for bona fide established commercial or selling agencies. According to 48 C.F .R § 3.401, “bona fide agency”
means an established commercial or selling agency, maintained by a contractor for the purpose of securing business, that neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds itself out as being able to obtain any Government contract or contracts through improper influence.
“Improper influence” is defined as “any influence that induces or tends to induce a Government employee or officer to give consideration or to act regarding a Government contract on any basis other than the merits of the matter.” Id.
A regulation provides a number of tools to be used in “determining whether an agency is a ‘bona fide established commercial or selling agency maintained by the contractor for the purpose of securing business.’ ” 41 C.F.R. § 101-45.313-4(e)(2). It acknowledges that the factors
are necessarily incapable of exact measurement or precise definition and it is neither possible nor desirable to prescribe the relative weight to be given any single factor as against any other factor or as against all other factors. The conclusions to be reached in a given ease will necessarily depend upon a careful evaluation of the agreement and other attendant facts and circumstances.

Id.

II
The party wishing to invoke the § 254(a) exception for established commercial or selling agencies bears the burden of showing that it applies. See Bradley, 159 F.2d at 40. The exception requires more than the existence of an agency relationship that sells. Puma Indus. Consulting Inc. v. Daal Assocs., Inc., 808 F.2d 982, 985 (2d Cir.1987); cf. Reynolds, 154 F.2d at 555. *837 A contrary reading would render meaningless the general prohibition that “no person or selling agency [be] employed or retained ... upon [a] ... contingent fee.” 41 U.S.C. § 254(a).
McCurdy Group correctly suggests that 41 C.F.R. § 101-46.3134(e)(2) provides useful tools for making this determination, but our evaluation must take into account the historical backdrop against which 41 U.S.C. § 254(a) and the relevant regulations were promulgated. Cf. Puma Indus., 808 F.2d at 985. In light of that history, I conclude that the exception for established commercial or selling agencies carries a specific meaning. It contemplates a relationship that by its very nature does not pose a special risk that improper influence will be exerted.[6] Counted in the class of established commercial or selling agents are the man who sells cars for an auto dealership, the woman who sells hardware at a major department store, and the college student who sells mobile telephones at an electronics shop. When the exception applies, there is by no means a complete absence of temptation to cheat, defraud, or connive, but that risk is tolerably low.
The jury, in considering the evidence before it, could have found that the parties’ arrangement fit 41 C.F.R. § 101-45.313 4(e)(2)’s description of a bona fide established commercial or selling agency maintained by the contractor for the purpose of securing business. That circumstance can not be dispositive, for, as we have seen, the record evidence must be considered in light of the public policy served by § 254(a) — the prohibition on the use of improper influence .[7]
The record on appeal is sufficient for us to conclude that the evidence points in only one direction — the parties’ relationship by its very nature posed a special risk that improper influence would be exerted. During trial, McCurdy testified:
Q. And, in fact, even before you and Jim signed what I call the letter of intent, you arranged meetings between Mr. Burgess and government officials in Washington; correct?
A. Yes, sir.
*838 Q. And you told Jim, among other things, did you not, that you felt you could gain access to critical decision makers at a higher level than ABGI had been dealing with up to that time.
A. Well, I believe I proved that in our first meetings.
(Appellant’s App. at 234-35.)
In a memorandum prepared by McCurdy entitled “Ten Reasons why the Burgess/McCurdy Team is a Winner,” Reason No. 2 stated: “Two great minds are better than one! Combine vision, skills and contacts to make a successful partnership.” (Id. at 329.) Reason No. 8 stated: “McCurdy’s access to the Administration, Congress and other key officials is invaluable.” (Id. at 330.) Asked about that document during trial, McCurdy stated that he
had contacts and knew people across the nation in both — in all the areas that we were looking at, whether it was the Department of Defense, Veterans Affairs, or the private sector, including the investment community....
Q. Well, that’s right. McCurdy’s access to the administration, Congress and other key officials is invaluable, you said; right?
A. That’s in addition to. Yes.
Q. Which administration are we talking about here when it says you had access to the administration? Which one?
A. The term, “administration” refers to the current administration.
Q. Which was what?
A. The Clinton Administration.
Q. Did you tell Jim Burgess that some of these officials owed you favors?
A. Nope. Absolutely not. None of them owe me favors. There are no favors.
(Id. at 238, 240.) In a memorandum dated January 2,1996, McCurdy wrote:
I also spoke to Senator A1 Simpson from Wyoming who is the chair of the Veteran’s Committee. He is a friend and I want to get the cost comparisons to him at some point to put the political pressure on the department. Once we get real numbers from both DOD and VA, we can mount a serious effort to get Congress engaged in “saving money”.
(Id. at 355A.)
Based on McCurdy’s testimony, I conclude that McCurdy Group did not fit the statutory exception to the contingent fee prohibition. The parties’ contract contemplated exploitation of McCurdy’s influence, including his valuable contacts, gained during his years in public service. We must keep in mind that “[i]t is the threat of persons selling government influence or access to government officials” that 41 U.S.C. § 254(a) protects against. Puma Indus., 808 F.2d at 985. “[A] restrictive approach ... is necessary in order to prevent the excepting clause from utterly defeating the purpose and effect of the warranty itself.” Le John Mfg., 222 F.2d at 51. It is of no consequence that, in addition to using his contacts, McCurdy also pitched ABGI’s services on the merits. Selling on the merits when the agency contract contemplated exertion of improper influence does not cure the contract’s infirmity. See Miss. Valley Generating, 364 U.S. at 550 & n. 14, 81 S.Ct. 294; Hazelton, 202 U.S. at 79, 26 S.Ct. 567. Thus, I would hold that the contingent fee arrangement violated public policy and was unenforceable.
Ill
Under Tenth Circuit Rule 10.1(A)(1)(a), appellant must provide the Court “the entire relevant trial transcript” when the suf *839 ficiency of the evidence is challenged. Pursuant to that provision, the majority holds that “ABGI’s failure to provide a complete copy of the trial transcript prevents our review” and summarily dismisses ABGI’s challenge to the arrangement’s legality. Slip op. 13. For the reasons previously expressed, I believe the record before us amply demonstrates the illegality of the parties’ agreement, and it is without reservation that I respectfully dissent.

. In Providence Tool, the Court observed that contingent fee arrangements "tend to introduce personal solicitation and personal influence, as elements in the procurement of contracts; and thus directly lead to inefficiency in the public service, and to unnecessary expenditures of the public funds.” 69 U.S. (2 Wall.) at 54. The matter was put more bluntly in Meguire v. Corwine, 101 U.S. 108, 111-12, 25 L.Ed. 899 (1879) (internal citations omitted):
The law touching contracts like the one here in question has been often considered by this court, and is well settled by our adjudications---- Frauds of this class to which the one here disclosed belongs are an unmixed evil. Whether forbidden by a statute or condemned by public policy, the result is the same. No legal right can spring from such a source. They are sappers and miners of the public welfare, and of free government as well. The latter depends for its vitality upon the virtue and good faith of those for whom it exists, and of those by whom it is administered. Corruption is always the forerunner of despotism.

. Subsequently, the Supreme Court, through Justice Holmes, reaffirmed its approval of the public policy against contingent fee arrangements:
The general principle was laid down broadly in Providence Tool Co. v. Norris that an agreement for compensation to procure a contract from the government to furnish its supplies could not be enforced, irrespective of the question whether improper means were contemplated or used for procuring it. And it was said that there is no real difference in principle between agreement to procure favors from legislative bodies, and agreements to procure favors in the shape of contracts from the heads of departments. [We have] said that all contracts for a contingent compensation for obtaining legislation [a]re void....
Hazelton, 202 U.S. at 79, 26 S.Ct. 567 (internal citations omitted); see also Miss. Valley Generating, 364 U.S. at 550 n. 14 (citing Ha *835 zelton with approval); ACME Process Equip. Co. v. United States, 171 Ct.Cl. 251, 347 F.2d 538, 548 (Ct.Cl.1965) (“Though the uncompromising rule stated in the Norris case has been tempered in the intervening years ..., its basic rationale was accepted and elaborated by Mr. Justice Holmes, speaking for a unanimous court....”); Bradley v. Am. Radiator & Standard Sanitary Coip., 6 F.R.D. 37, 40 (S.D.N.Y.1946) (“The language of the Supreme Court in the Providence Tool Co. and Hazelton cases is explicit and rather sweeping.”).

. ACMA Process Equip., 347 F.2d at 549 n. 10 (citing Barron & Munves, The Government Versus the Five-Percenters: Analysis of Regulations Governing Contingent Fees in Government Contracts, 25 Geo.Wash.L.Rev. 127 (1957)).

. For a discussion of the quoted terms, see Subcomm. on Investigations, Comm, on Expenditures in the Executive Dep'ts, The 5-Percenter Investigation, S.Rep. No. 81-1232, at 3-5 (1950).

. S.Rep. No. 81-1232, at 3-5, listed a number of factors, including the following:
(1) "The 5-percenter emphasizes whom he knows and attempts to create the impression that to be successful in dealing with the government you must know the right people.” Id. at 5.
(2) “Generally, the 5-percenter will discuss in some detail how he succeeded in other cases in defeating his client’s competitors by knowing just where to exert the proper pressure.” Id.
(3) "Usually he will apply the social technique to the problem to impress the client.” Id.

. The majority notes that this legal conclusion "cannot provide a basis for reversal in this case" because the "theory ... has never been propounded by defendant, either in the district court or on appeal, and the jury was never instructed on it.” Slip op. at-n. 4. I disagree and make some general observations.
As a preliminary matter, failure to object to a jury instruction in the district court does not necessarily foreclose its review on appeal. See Zimmerman v. First Fed. Sav. & Loan Assn, 848 F.2d 1047, 1054 (10th Cir.1988) ("Therefore, ‘[t]his court will not review instructions given to which no objections were lodged before the jury retired for deliberation unless they are patently plainly erroneous and prejudicial.’ ”) (quoting Moe v. Avions Marcel Dassault-Breguet Aviation, 727 F.2d 917, 924 (10th Cir. 1984)).
As we have said in another context, "[p]arties to a dispute cannot stipulate to the law and assume that the court will follow blindly an incorrect interpretation of the law.” Carlile v. S. Routt Sch. Dist. Re-3J IN, 739 F.2d 1496, 1500 (10th Cir. 1984). This is particularly true when a case primarily involves a matter of high public importance. Cf. Sussman v. Patterson, 108 F.3d 1206, 1210 (10th Cir. 1997) (considering the importance of public policy in reaching the merits of issue not raised in the district court). Unlike run-of-the-mill contract cases, which predominantly implicate the rights and obligations of private parties, we are dealing with a broad and longstanding policy intended to protect the integrity of public institutions.

. Cf. Puma Indus., 808 F.2d at 985 ("The consideration and application of these enumerated factors can be meaningful only in light of the policies underlying § 254(a)."); 48 C.F.R. § 3.408-2(c) (1995) ("However, the guidelines are not individually or collectively inviolable rules. The contracting officer must evaluate each arrangement in its totality, including attendant facts and circumstances.”).